Filed 1/21/14  In re Jason L. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re JASON L., JR., a Person Coming Under the Juvenile Court Law. | D064390 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J518614) |
| v. | |
| C.L., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Kenneth J. Medel, Judge.  Affirmed.

Monica Vogelmann, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Dana C. Shoffner, Deputy County Counsel, for Plaintiff and Respondent.

C.L. appeals the judgment entered following the jurisdiction and disposition hearings in the juvenile dependency case of her minor son, Jason L., Jr. (Jason Jr.). She contends the evidence was insufficient to support the court's jurisdictional finding under Welfare and Institutions Code section 300, subdivision (e),[1] and the court's denial of reunification services to C.L. under section 361.5, subdivisions (b)(5) and (c). We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On January 26, 2013, C.L. called 911 and requested medical assistance for her son, Jason Jr. C.L. said that Jason Jr. had suffered from flu-like symptoms and a high fever for approximately 24 hours, and then he became unresponsive. When paramedics arrived at C.L.'s home in San Diego, she emerged, handed Jason Jr. to the paramedics, returned inside, and shut the door quickly behind her. During their brief glimpse through the doorway, the paramedics noticed that C.L.'s home was filthy, full of trash, and foul-smelling. C.L. was Jason Jr.'s primary caregiver, and she was the only adult in the home. Jason L., Sr. (Jason Sr.), C.L.'s husband and Jason Jr.'s father, had been on deployment for several months with the United States Navy (Navy).

Jason Jr., then two years old, was covered in vomit and feces. The paramedics transported him to the hospital for treatment, where he was admitted in serious condition. Jason Jr. was severely dehydrated, in an altered mental state, with sunken eyes, poor skin tone, visible ribs, and a yellow crust covering his face. He was very thin, and his

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

extremities appeared to be those of a one year old. The skin on his genitals and groin area had broken down from lack of care and infrequent diaper changing. The hospital determined that Jason Jr. had acute kidney injury and damage to his liver and pancreas resulting from severe dehydration. Jason Jr. had also suffered a stroke and lack of oxygen to the brain from the dehydration. If Jason Jr. had not received medical attention, he may have died within days.

At the hospital, C.L. herself was unkempt and her strong odor was distracting to medical personnel. She was directed to take a shower and clean herself up. When medical personnel and social workers attempted to interact with C.L., she was largely unresponsive. She cried, rocked back and forth, and could only answer a few questions. She did not attend to Jason Jr. without prompting. She said that she knew that her home condition was "pretty bad" and that she had not cleaned or taken out the trash since her husband had left on deployment months earlier. She said she only changed Jason Jr.'s diapers twice per day, though she said she knew she should do so more often. She said that she left Jason Jr. in his crib because her home was so filthy.

C.L. has a history of depression, and she cited "feel[ing] sorry for [herself]" as a reason for her lack of care of Jason Jr. She said that she did not leave the house much and spent most of her days on her computer "looking at stuff." She was not under psychiatric care, but she admitted she needed help. She denied any drug use or alcohol abuse. When asked about Jason Jr.'s condition, C.L. claimed that she fed him and gave him liquids regularly. She maintained that his symptoms came on suddenly, either the night before the paramedics were called or that morning. However, medical personnel

3

reported that it was unlikely that Jason Jr. could have reached such an "extreme condition" within 24 hours.

Jason Sr. was granted emergency leave from his deployment and returned to San Diego. Jason Sr.'s mother and sister also travelled to San Diego from their homes in Chicago, Illinois to help take care of Jason Jr. in the hospital. Jason Sr. admitted that he knew C.L. was depressed before he deployed. However, he said he did not know about C.L.'s neglect of Jason Jr. or the condition of their home.

While Jason Jr. was in the hospital, the San Diego County Health and Human Services Agency (the Agency) petitioned the juvenile court under section 300, subdivisions (b) and (e), on his behalf. The Agency alleged that Jason Jr. had suffered or was at substantial risk of suffering severe physical harm or illness based on his parents' inability to care for him. The Agency alleged that C.L. has a mental illness or other condition that renders her unable to provide Jason Jr. with proper care and that Jason Sr. was deployed and unable to protect Jason Jr. The Agency further alleged that Jason Jr. had suffered severe physical abuse, including severe dehydration caused by neglect. Jason Jr.'s severe dehydration resulted in acute kidney injury and stroke, among other harms. At the court's detention hearing, it found that the Agency had presented a prima facie case under section 300, subdivisions (b) and (e), and ordered that Jason Jr. be detained in out-of-home care when he was well enough to leave the hospital.

Jason Jr. was eventually discharged after 19 days in the hospital, including several days in a pediatric intensive care unit. Jason Jr. was placed in the care of his paternal grandmother, who was staying temporarily at a relative's home outside of San Diego.

4

C.L. and Jason Sr. expressed ambivalence about their future with him. While they requested reunification services, they also stated that they might consider a plan of guardianship or adoption with a relative. Both Jason Jr.'s paternal grandmother and aunt expressed their desire to provide him with long-term care. Jason Jr.'s aunt specifically stated that she would like to adopt Jason Jr.

C.L., Jason Sr., Jason Jr.'s paternal grandmother and aunt, and Agency social workers participated in a team decision making session where they discussed Jason Jr.'s future. At the session, C.L. stated that she did not believe she could take care of Jason Jr.'s needs or keep him safe. She was in favor of adoption by a relative. Jason Jr.'s parental grandmother and aunt were also in favor of adoption. Jason Sr. was upset by C.L.'s admission that she could not care for Jason Jr. Jason Sr. stated that he could not care for Jason Jr. himself, given his obligations to the Navy, and expected C.L. to do so. However, at the end of the session, Jason Sr. agreed that a permanent plan of adoption was best for Jason Jr. C.L. and Jason Sr. agreed that Jason Jr. would return to Chicago with his paternal grandmother as soon as practicable.

The juvenile court held a contested document trial on jurisdictional issues. After considering the evidence, the court sustained the Agency's allegation under section 300, subdivision (b). The court dismissed the Agency's allegation under section 300, subdivision (e), because the court found that the water was not "food" for purposes of that

5

statute.[2]  However, the court allowed the Agency to amend its petition to add a section 300, subdivision (a) allegation to conform to proof.  The court then sustained that allegation.  The court later reconsidered its finding on the Agency's section 300, subdivision (e) allegation and interpreted "food" to include liquid nourishment.  With that interpretation, the court sustained the Agency's section 300, subdivision (e) allegation as well.

The court continued its first scheduled disposition hearing to allow the Agency time to set up an Interstate Compact for the Placement of Children (ICPC) evaluation in Chicago.  In the meantime, Jason Jr. and his paternal grandmother were allowed to leave San Diego and reside in Chicago.  Another scheduled disposition hearing was continued to allow further time to resolve issues related to ICPC.  Four months after the court's initial jurisdiction hearing, the court held a contested disposition hearing for Jason Jr.

During this time, C.L. started taking medication for depression and began therapy.  She reported that her life was easier without Jason Jr. and that her mood was improving.  C.L. kept in contact with Jason Jr. and his paternal grandmother through daily telephone calls and Skype video conferences. Despite C.L.'s improvement, her therapist reported that she still had not expressed a great deal of remorse for her neglect of Jason Jr.  Her therapist also said that she "has not shown any sympathy for the child."  C.L. still felt

---

[2]     The provision in question establishes jurisdiction where there is a "willful, prolonged failure to provide adequate food" to a child under the age of five years.  (§ 300, subd. (e).)  In this appeal, C.L. does not argue that liquid nourishment is not "food" within the meaning of this provision.  For purposes of this appeal, we assume without deciding that "food" as used in this provision includes liquid nourishment.

under stress, and she had a self-described "breakdown" that led her to visit the emergency room a few days before the disposition hearing.

C.L. did not initially pursue Agency services such as parenting classes. However, in the weeks leading to the contested disposition hearing, C.L. attended classes through the Navy and a local provider. An official from the Navy program reported that C.L. appeared "[i]mmature and lacks understanding of parenting skills." C.L. also had a "[b]lunted affect." Despite their earlier statements in favor of adoption, both C.L. and Jason Sr. stated that their goal was to regain custody of Jason Jr. and participate in whatever services were necessary to achieve that.

At the contested disposition hearing, the Agency recommended that Jason Sr. receive reunification services, but that C.L. not do so. The Agency did not believe that reunification services were likely to be successful in addressing the reasons for C.L.'s abuse and neglect of Jason Jr. because C.L. lacked engagement in Jason Jr.'s care and she failed to express responsibility or remorse for Jason Jr.'s severe neglect. The Agency opined that C.L. had never formed a serious bond with Jason Jr. The Agency also recommended that Jason Jr. remain in Chicago with his paternal grandmother and that the court approve an ICPC evaluation with his paternal aunt.

C.L. opposed the Agency's recommendation that she not receive services. She testified that her depression had been greatly reduced by medication and therapy. She said that she had remorse for what happened to Jason Jr. and was committed to becoming a better parent. She had also started taking classes to obtain her general equivalency diploma (GED), and her teacher reported that she was an excellent student and active

7

participant. Her psychiatrist and psychologist provided letters in which they attested to C.L.'s improved mood and motivation to improve herself. On cross-examination, C.L. admitted that she had been inattentive to Jason Jr.'s needs even before the severe neglect that led to this case. She also admitted that she had resisted her mother-in-law's efforts to improve her parenting.

Because the court made a finding that section 300, subdivision (e) applied, reunification services could not be provided to C.L. unless the court found that reunification services were "likely to prevent reabuse or continued neglect of the child or that failure to provide reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd. (c).) At the disposition hearing, the court noted that C.L. had made some effort to improve her life, but it was not persuaded that reunification services were likely to prevent reabuse or continued neglect. The court expressed its view that C.L. had deep-seated psychological issues, including her recent "breakdown" and visit to the emergency room, that were unlikely to be addressed sufficiently by reunification services. The court noted that C.L. herself had expressed doubt about her ability to care for Jason Jr. The court also found that no evidence had been presented of a close and positive attachment between C.L. and Jason Jr. such that failure to provide reunification would be detrimental to the child. Accordingly, the court adopted the Agency's recommendation and denied reunification services to C.L. The court ordered services for Jason Sr., however, and approved the Agency's case plan for him. C.L. appeals.

8

DISCUSSION

I

C.L. contends that the evidence does not support the juvenile court's jurisdictional finding under section 300, subdivision (e). That statute provides for jurisdiction where "[t]he child is under the age of five years and has suffered severe physical abuse by a parent . . . ." (§ 300, subd. (e).) As relevant here, " 'severe physical abuse' " includes "the willful, prolonged failure to provide adequate food." (*Ibid.*)

C.L. first argues that the word "willful" in the statute requires proof that "[C.L.]'s acts or omissions were deliberate and intentional, with an intent to cause harm." C.L.'s argument presents an issue of statutory construction, which we review independently. (*In re Marquis H.* (2013) 212 Cal.App.4th 718, 725.)

"Our goal is to determine the Legislature's intent and adopt a construction that best effectuates the purpose of the law. [Citations.] We begin with the statutory language because it generally provides the most reliable indication of legislative intent. [Citations.] ' "If the statutory language is unambiguous, we presume the Legislature meant what it said, and the plain meaning of the statute controls. [Citation.]" [Citation.] We consider extrinsic aids, such as legislative history, only if the statutory language is reasonably subject to multiple interpretations.' " (*In re W.B.* (2012) 55 Cal.4th 30, 52.)

The only authority cited by C.L. in support of her argument that the word " 'willful' " requires an intent to cause harm is *Torres v. Parkhouse Tire Service, Inc.* (2001) 26 Cal.4th 995 (*Torres*). In that case, our Supreme Court considered a provision of California's workers' compensation statutes that excepts a " 'willful and unprovoked

physical act of aggression' " by a coworker from the exclusive scope of the workers'

compensation system.  (*Id.* at p. 1002; see also Lab. Code, § 3601, subd. (a)(1).)  The

Supreme Court explained, "By adding the term 'willful,' the Legislature has underscored

the need for an intent to bring about the consequences of that expression, i.e., an intent to

inflict injury or harm."  (*Torres,* at p. 1005.)  Importantly, however, the Supreme Court

emphasized that the word " 'willful' " only had such a connotation when it modified "an

already intentional or deliberate act," i.e., a "physical act of aggression."  (*Id.* at p. 1006.)

The Supreme Court distinguished other provisions in California's workers' compensation

statutes that used " 'willful' " in a way that did not require an intent to inflict injury or

harm.  (*Id.* at pp. 1005-1006.)

As an initial matter, it is unclear whether the Supreme Court's analysis of a

workers' compensation statute has any application to the juvenile dependency statute at

issue here.  "Given the complexity of the statutory scheme governing dependency, a

single provision 'cannot properly be understood except in the context of the entire

dependency process of which it is part.' "  (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1235.)

Even assuming that *Torres* could have some bearing on the use of "willful" in section

300, we conclude that the Supreme Court's analysis is inapplicable to the statute at issue

here.  The word "willful" modifies the "failure to provide adequate food."  (§ 300, subd.

(e).)  A "failure" may plainly be intentional or unintentional.  Thus, because the word

" 'willful' " here does not modify "an already intentional or deliberate act," it does not

have the connotation the Supreme Court found in *Torres*.  (See *Torres, supra*, 26 Cal.4th

at p. 1006.)

10

The ordinary meaning of "willful" is "[v]oluntary and intentional, but not necessarily malicious." (*Black's Law Dict.* (9th ed. 2009) p. 1737, col. 2.) Similarly, the Penal Code states that the word "willfully" "implies simply a purpose or willingness or commit the act, or make the omission referred to. It does not require any intent to violate law, or to injure another, or to acquire any advantage." (Pen. Code, § 7, subd. 1.) C.L. has provided no reason to depart from this ordinary meaning, and we conclude that it applies here.[3]

Applying this interpretation to the facts here, we conclude that substantial evidence supports the juvenile court's finding under section 300, subdivision (e). (See *In re E.H.* (2003) 108 Cal.App.4th 659, 669.) Under the substantial evidence standard, we do not "reassess the credibility of witnesses or reweigh the evidence. [Citation.] Conflicts in the evidence must be resolved in favor of the juvenile court's findings, and the evidence must be viewed in the light most favorable to the judgment, accepting every reasonable inference that the court could have drawn from the evidence. [Citations.] Thus, we must uphold the juvenile court's factual findings if there is any substantial evidence, whether controverted or not, that supports the court's conclusion." (*In re S.C.* (2006) 138 Cal.App.4th 396, 415.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the court's findings or orders." (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 147.)

---

[3]     In light of our conclusion, we need not address the Agency's contentions regarding the meaning of "willful misconduct" in context of intentional torts.

11

Jason Jr. was admitted to the hospital with severe dehydration, in an altered mental state, with sunken eyes, poor skin tone, visible ribs, and very thin extremities. Jason Jr.'s doctors described his condition as the result of "severe neglect." C.L. was Jason Jr.'s sole caregiver and responsible for providing him with adequate food and water. C.L. admitted that she was neglectful of Jason Jr., stating that "I wasn't taking care of him (minor) how I should have."

C.L. argues that her failure to provide Jason Jr. with adequate food was not willful because she suffers from depression. We disagree. C.L. has provided no evidence that her depression prevented her from acting voluntarily. To the contrary, C.L. was able to feed herself and undertake other intentional activities when she wished. She simply did not direct her attentions to her son. C.L. admitted that "I knew I needed help and I didn't want to ask." Under these circumstances, C.L.'s depression does not preclude a finding of willful failure to provide adequate food.

C.L. further argues that there is no support for the court's finding that her failure to provide adequate food was "prolonged." C.L. points to comments by Jason Jr.'s doctors that Jason Jr. suffered a "rapid deterioration" and that his stroke was "an acute event." However, Jason Jr.'s doctors stated that "the severe dehydration wouldn't have happened overnight and the mother should have known that the child was severely dehydrated." When he was admitted to the hospital, Jason Jr. was very thin, with sunken eyes, poor skin tone, and visible ribs. The doctors determined that Jason Jr.'s stroke, which was caused by severe dehydration, occurred "anywhere from [five-seven] days ago and up to [two] weeks ago," i.e., several days to a week before Jason Jr. was admitted to this

12

hospital. The fact that Jason Jr.'s stroke itself was "an acute event" does not mean that his dehydration was not prolonged.

Jason Jr. was at risk of death if his deprivation of food had been only a few days longer. That is, if his deprivation had been any more "prolonged," he may have died. Contrary to C.L.'s assertion, Jason Jr.'s partial recovery over the following month is not evidence that he was not subjected to prolonged deprivation. It merely shows that Jason Jr.'s doctors were effective in treating him. Considering all of the evidence, we find sufficient evidentiary support for the court's order, including its finding that C.L.'s failure to provide adequate food was prolonged.[4]  (See § 300, subd. (e).)

## II

C.L. next contends that the juvenile court erred in failing to order reunification services for her. Because the court made a jurisdictional finding under section 300, subdivision (e), the court could not order reunification services for C.L. "unless it finds that, based on competent testimony, those services are likely to prevent reabuse or continued neglect of the child or that failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." (§ 361.5, subd.

---

[4]  On reply, C.L. relies on several sources of medical information from the Internet. These sources were not before the juvenile court, and C.L. has not complied with the applicable rules of court in her effort to bring them to our attention in this appeal. (See, e.g., Cal. Rules of Court, rule 8.252.) We therefore decline to consider them. (See *In re Zeth S.* (2003) 31 Cal.4th 396, 405 ["It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.' "]; *Canal Ins. Co. v. Tackett* (2004) 117 Cal.App.4th 239, 243.) Moreover, even if we were to consider these sources, they would not change our assessment of the substantial evidence supporting the court's jurisdictional finding under section 300, subdivision (e).

(c); see also *In re Troy Z* (1992) 3 Cal.4th 1170, 1174.) "Thus, once [the Agency] proves by clear and convincing evidence that a dependent minor falls under subdivision (e) of section 300, the general rule favoring reunification services no longer applies; it is replaced by a legislative assumption that offering services would be an unwise use of governmental resources." (*Raymond C. v. Superior Court* (1997) 55 Cal.App.4th 159, 164.) This situation is often referred to as a " 'bypass' " of services. (*In re A.M.* (2013) 217 Cal.App.4th 1067, 1074.) We review the juvenile court's order for substantial evidence. (*In re Albert T.* (2006) 144 Cal.App.4th 207, 216.)

C.L. contends that the court's failure to find that reunification services are likely to prevent reabuse or continued neglect of Jason Jr. is not supported by substantial evidence.[5] Stated another way, her argument is that there is no substantial evidence supporting the court's view that reunification services were unlikely to be successful. We disagree. From the outset of this juvenile dependency case, C.L. was unsure whether she wanted to pursue services. She was inattentive to Jason Jr. in the hospital and disengaged from subsequent meetings regarding his care and custody. C.L. admitted that her life was easier without him. At the Agency's team decision making session, C.L. stated that she did not believe she could take care of Jason Jr.'s needs or keep him safe. She allowed Jason Jr. to travel back to Chicago with his paternal grandmother and expressed her

---

5    C.L. does not, in this appeal, make any argument based on the second prong of the relevant portion of section 361.5, subdivision (c), that "failure to try reunification will be detrimental to the child because the child is closely and positively attached to that parent." We therefore need not address it.

14

support for his adoption by a relative. C.L. did not pursue services, through either the Agency or the Navy, until shortly before the court's contested disposition hearing.

While the evidence shows that C.L. was able to make some positive steps in her own life, including taking medication for her depression and beginning GED classes, these facts do not compel a finding that reunification services would likely be successful. C.L.'s therapist reported that C.L. still had not shown "a lot of expression of remorse. She has not shown any sympathy for the child. Just no significant remorse." C.L. showed "a serious lack of attachment and bond" with Jason Jr. Though he recognized that C.L. had made progress, the Agency's social worker expressed his opinion that reunification services would not be successful. C.L. did not present any expert testimony regarding the likelihood that reunification services would succeed in her case.

C.L. argues that substantial evidence does not support the court's order because none of the factors listed in section 361.5, subdivision (c) are present here. Those nonexclusive factors provide guidance to courts in determining when reunification services are unlikely to be successful. Here, however, the juvenile court's finding under section 300, subdivision (e), creates a presumption that services should not be offered. (§ 361.5, subd. (b)(5) and (c).) "While [the Agency] has the statutory duty to investigate and present the court with information about the prognosis for a successful reunification, it is not required to prove the services will be unsuccessful." (*Raymond C. v. Superior Court, supra*, 55 Cal.App.4th at p. 164.) It was C.L.'s burden to show that reunification

15

services were likely to prevent reabuse or continued neglect on the record provided by the Agency and any evidence that she chose to offer.[6] (*Ibid.*; see also § 361.5, subd. (c).)

Although C.L. has cited evidence of her positive progress, she has not shown the absence of substantial evidence supporting the juvenile court's order denying services. "We do not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts. [Citation.] The judgment will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228.) Reviewing the record as a whole, we conclude that substantial evidence supports the juvenile court's order denying reunification services. (See § 361.5, subd. (c).)

DISPOSITION

The judgment is affirmed.

BENKE, Acting P. J.

WE CONCUR:

McDONALD, J.

IRION, J.

---

6      Similarly, C.L.'s reliance on *In re D.F.* (2009) 172 Cal.App.4th 538 is unavailing. That opinion considered a different standard, the " 'best interest of the child,' " and found no abuse of discretion in the juvenile court's refusal to order reunification services. (*Id.* at pp. 546, 547.)

16